[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff and the defendant were married on March 4, 1988, in Great Barrington, Massachusetts. They were originally separated in November of 1991, reconciled briefly, and finally seperated [separated] in August of that same year. After hearing the evidence, the court entered a decree of dissolution of the marriage, finding that the marriage had indeed irretrievably broken down, and changed the defendant's name, as requested, to Nina Seymour Bennett.
The parties had a brief courtship. The defendant CT Page 9473 had been a dairy farmer all of her life, having grown up on her father's farm in New Preston. She moved her herd to Sharon after her father's death, and continues in that occupation. An acquaintance of both parties introduced them. The plaintiff had worked with his parents at their cattle auction business, and intimated that he would like to farm. At that time, the defendant had a full-time farm hand in her employ, and managed a herd of high quality Holsteins.
The parties certainly seemed to have compatible interests in the cattle and farm business, and shortly after they began dating, the plaintiff moved into the defendant's home, and within the next few months they were married. The testimony of the parties was similar, insofar as the beginning of their marital relationship was concerned. They worked together, bought cows, and the plaintiff claimed that he greatly increased the size and quality of the herd.
The defendant indicated that she had been respected for the quality of her herd prior to meeting the plaintiff, and that any acquisitions of cattle were countered during the marriage by downsizing when the herd was moved. The parties did not agree on the value of any acquisitions, nor was there any evidence as to the increase in value of the herd during the marriage. The plaintiff made several claims, none of which were specifically proved. The plaintiff introduced into evidence the tax returns for the years 1988 through 1993 (Pl. Exh. 11-16, inclusive), which demonstrated a decrease each year of the marriage in the gross receipts of the farming operation.
The plaintiff testified that he had helped in the farming operation, and that he had used his knowledge of cattle trading to improve the herd. The evidence was not compelling on this issue, however. No documentary evidence supported his position, and he testified that his accounting for his cattle purchasing was "in his head." The court was asked to credit that information in the face of a sworn financial affidavit, filed contemporaneously with the first day of evidence which defied credibility. The court was further asked to credit his testimony in the face of other evidence, CT Page 9474 conceded by the plaintiff that he had spent as much as Thirteen Thousand ($13,000.00) Dollars to Fourteen Thousand ($14,000.00) Dollars in a calendar year on hunting trips. He was clearly not a person of no means, yet he averred, under oath, that he was unemployed and made absolutely no income.
The plaintiff was not able to articulate the reasons why he felt his marriage did not prosper. He testified that the defendant was critical of him, and that he felt she had an interest in a new farm hand. None of those reasons seemed to square with the other evidence. The plaintiff testified that the defendant, who was older than he by thirteen (13) years, was unable to have children, and that she had failed to disclose that fact to him prior to the marriage. She countered that they had discussed that fact, and that he had said that it did not matter.
The defendant testified that at first the plaintiff had some enthusiasm for farming, but that ultimately yielded to his other interests of hunting, cattle dealing, and horse pulling contests. She testified that they argued about honesty. He often would want to add cows to the herd when an evaluation was done, or misrepresent what the cows were producing. The largest acquisition of cows was in August of 1988, when the parties received a Thirty-eight Thousand ($38,000.00) Dollar loan from Farm Credit to complete the purchase. It remains her debt today.
The plaintiff was injured at his parents' auction business prior to a barn fire in January of 1989. He currently has a open law suit against their business, for which the defendant has made no claim. The parties moved the cows that survived the fire to a barn in New York State, approximately five (5) miles away, and moved them back to the barn in Sharon, after reconstruction, in the fall of 1989. The parties argued over the plaintiff's absences, sometimes for a couple of days without notice. In the spring of 1991, he started competing in horse pulls, and was away some weekends. As the season wore on, he was away each weekend and worked the horses each day. CT Page 9475
The stress on the marriage evolved until November of 1991, when the plaintiff went to see Attorney Christopher Dakin and had him prepare a separation agreement, which the defendant signed, after having visited an attorney. The defendant testified that after the plaintiff had announced that he was leaving, she tried to talk to him, but if he was at home, he was accompanied by a friend. He took farm and horse equipment, and the draught horses, and other property listed in the Separation Agreement. She was left with the cows, the farming operation, and some equipment. (See Def. Exh. 1) She was also left with the farm debt as well as the farm labor.
The defendant said that the period of time during the announcement of the plaintiff that he was leaving, the insistence that she sign the separation agreement, and the speedy departure of the plaintiff was very difficult. She received support and help from her family and friends, and repaid certain loans to Leo Kaplan (Def. Exh. 4, 5, 6, and 7). The plaintiff had refused to give her time before he left, and refused to see a marriage counselor. After he left with the property listed on the separation agreement on November 15, 1991, he did not call until the end of December, when the insurance proceeds from his stolen truck were received, and he had to ask her to endorse the check.
In February of 1992, the plaintiff returned to the farm and told the defendant he was sorry and that he had made a mistake. Despite her shock and lack of trust, she met with him over the next two weeks. She testified that he talked more than he ever had, promised that he could be responsible to the marriage and the farm. She testified that she had taken quite a loss, and that he would not say where the property was that he had taken from the farm, or how much he sold things for. She agreed to resume living with him, and to resume marital relations with him. During that period, he asked her several times to rip up the separation agreement, but she refused. She did not have the farm equipment that he had sold, and all of the cows had been transferred to her name alone.
In late April, he was hospitalized, and upon his CT Page 9476 return to the farm, his ability to work was limited. He continued with his horse pulls, however. He started staying out later, and they began to argue. During this time, detectives arrived at the house and told her that they wanted to speak to the plaintiff. They had found his stolen truck in the possession of some one who indicated that the plaintiff had sold it to him. She was told that he was spending weekends with Cindy Smart in Vermont. He refused to come home from a horse pull in Vermont, and the attempt at reconciliation failed. Again, the plaintiff left with the property he came back to the marriage with, which was all of the property listed on the original separation agreement, less those items he had sold and retained the proceeds. The defendant conceded that there was a One Thousand, Five Hundred ($1,500.00) Dollar payment of joint taxes made by plaintiff in the six (6) months of their reconciliation.
The defendant claimed at the commencement of trial that the plaintiff should be bound by his own requested separation agreement, which agreement was signed by the him, and the terms of which had been executed. The court denied the motion in limine, and insisted that the parties provide evidence as to the nature of their claims, the nature of the separation agreement and its signing, and the intent of the parties upon re reconciliation. Mitchell v. Mitchell, 194 Conn. 312
(1984), Morrison v. Morrison, ___ N.C. ___,402 S.E.2d 855 (1991). The court must determine not only the nature of the agreement insofar as it may be a property settlement, but also inquire into the appropriateness of the agreement.
The court must find that there was a reconciliation, as opposed to cohabitation as a prelude to reconciliation. The parties engaged in some negotiation before the attempt was made, and throughout the period of cohabitation, she refused to tear up the separation agreement, despite the plaintiff's protest that he had destroyed his. She testified about her concerns, and lack of trust which clearly never abated during the period of cohabitation. The court finds from the evidence that there was no reconciliation of and between the parties subsequent to the signing of CT Page 9477 the separation agreement.
The parties never commingled their separate property after their separation, despite their attempt at reconciliation, and despite the fact that they worked together again in the farming operation for a short period. The plaintiff is bound by the original agreement that he designed, and cannot now come back to this court to claim that it was unfair.
The court has assessed the agreement in light of the facts adduced at trial. The court finds that in light of the history of the parties, and the statutory criteria for the distribution of marital property, the agreement as signed by the parties was fair and equitable. The court would not have disturbed the agreement of the parties if it had been proposed for court review in an uncontested dissolution proceeding.
The remaining issue for the court is the reargument of the court's award of attorney's fees during a pendente lite argument, awarding the defendant an allowance to prosecute in the amount of Five Thousand ($5,000.00) Dollars. Based upon the plaintiff's lack of candor with respect to the disposition of any of the funds acquired in the disposition of his property settlement, and his lack of credibility with respect to his current earnings, and this court's finding that he is employable, and has assets available from that property settlement, the court will not reverse its prior award of attorneys fees. The court will also note that the defendant has claimed, and requested that this court order fees in the amount of Twelve Thousand, Five Hundred ($12,500.00) Dollars. The court will limit the award to Five Thousand ($5,000.00) Dollars.
Judgment shall issue consistent with this opinion.
DRANGINIS, J. CT Page 9478